JUN 0 1 2007

JAMES N. HATTEN, Clerk
By: *JPurett* Deputy Clerk

# PETITION FOR WRIT OF HABEAS CORPUS

## UNDER 28 U.S.C. SECTION 2254

Prisoner's Name:           VIRGIL DELANO PRESNELL

Prisoner's Number:         ID 379660

Place of Confinement:      Georgia Diagnostic and Classification Prison
                           Jackson, Georgia 30233

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| VIRGIL DELANO PRESNELL, )<br><br>Petitioner, )<br><br>v. )<br><br>HILTON HALL, Warden,<br>Georgia Diagnostic and )<br>Classification Prison, )<br><br>Respondent. ) | Civil Action **1 : 07 - CV - 1267**<br><br>No ▬▬▬▬▬▬▬<br>**-CC1**<br><br>Death Penalty Case |

### PETITION FOR WRIT OF HABEAS CORPUS
### BY A PERSON IN STATE CUSTODY

Comes now the Petitioner, Virgil Delano Presnell, by and through undersigned counsel, and invokes this Court's jurisdiction pursuant to 28 U.S.C. Section 2254.

The allegations of this petition are in the form dictated by the Model Form for Use in Applications for Habeas Corpus under 28 U.S C. Section 2254, prescribed by the Rules Governing Section 2254 Cases in United States District Courts. Petitioner seeks this Court's protection and intercession because the Georgia state courts have violated Petitioner's rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, resulting in Petitioner's unconstitutional convictions and sentences. The state courts have likewise refused to correct these violations. To the extent that the state courts reached the merits of claims presented, the holdings are either contrary to or are an unreasonable application of, clearly established Federal law as established by the United States Supreme Court.  28 U.S.C.§ 2254 (d)(1). To the extent that the state courts' determinations of the claims presented are based upon factual findings, the state court determinations rest upon an unreasonable determination of said facts in light of the evidence presented  *See*, 28 U S.C. § 2254(d)(2); *Terry Williams v. Taylor*, 529 U.S. 362 (2000).

2

Petitioner requests that this Court afford him all the protections promised by federal habeas corpus statutes, the Rules Governing 28 U.S.C. Section 2254 Cases in the United States District Courts, the Criminal Justice Act, the Anti-Drug Abuse Act of 1988, and all other pertinent statutes, court rules, and case law. Finally, Petitioner seeks an order granting an evidentiary hearing in order to present the necessary evidence in support of his claims, as well as an order granting this petition for writ of habeas corpus.

## I. PROCEDURAL HISTORY

1.     On July 1, 1976, Virgil Presnell was indicted on charges of murder, rape, kidnaping with bodily injury, kidnaping, and aggravated sodomy, for the murder of Lori Smith. One week before trail, the charge of aggravated sodomy was dismissed. A jury subsequently found petitioner guilty on all counts.

2.     The name and location of the court which entered the judgment of conviction and sentence under attack are:

Superior Court of Cobb County

Marietta, Georgia

3     The date of the judgment of conviction was August 26, 1976.

4.     Petitioner was convicted of malice murder, kidnaping, kidnaping with bodily injury, and rape

3

5.    Petitioner was sentenced to three death sentences.

6    The date of judgment of petitioner's original sentence was August 26,

1976.

7.    At trial petitioner pled not guilty.

8.    Petitioner testified on his own behalf at trial.

9.    The trial on the issue of guilt or innocence and on the issue of

sentencing was determined by a jury.

10.    Petitioner appealed his convictions and sentences   The facts of

petitioner's first appeal are as follows:

    (a)    The Supreme Court of Georgia affirmed petitioner's

convictions and sentences in part, and vacated in part, on

March 7, 1978. *Presnell v. State*  241 Ga  249, 243 S.E. 2d 496

(1978).  Specifically, the court vacated the convictions and

death penalty for the rape charge and the vacated the death

sentence for the kidnaping with bodily injury charge, and

remanded with instructions.   The court affirmed petitioner's

death sentence for murder   Reconsideration was denied on

March 28, 1978

4

(b)  Certiorari to the United States Supreme Court was timely filed. The Supreme Court granted certiorari. The Court reversed the affirmance of petitioner's conviction of kidnaping with bodily injury and of petitioner's death sentence for murder, and remanded for further proceedings. *Presnell v. Georgia*, 439 U.S. 14, 17 (1978).

(c)  On remand, the Georgia Supreme Court vacated a portion of its previous opinion consistent with the directions from the United States Supreme Court, and affirmed the death penalty for murder, holding that aggravated sodomy could provide the element of bodily injury for the kidnaping offense, and remanded with instructions that the trial court resentence the petitioner for the charges of kidnaping with bodily injury and statutory rape. *Presnell v. State*, 252 S.E. 2d 625, 627 (1979).

(d)  Petitioner timely filed a Petition for Writ of Certiorari in the United States Supreme Court  Certiorari review was denied on October 1, 1979. *Presnell v. Georgia*, 444 U.S. 885 (1979). Rehearing was denied on November 13, 1979. *Presnell v. Georgia*, 444 U.S. 957 (1979).

5

(e)     The trial court resentenced Petitioner in accordance with the

Georgia Supreme Court's directions.

11.     Petitioner filed a Petition for Writ of Habeas Corpus in the Superior

Court of Butts County on January 8, 1980.   This petition was denied on January 9,

1980.  Petitioner filed an Amended petition on January 10, 1980, which was

denied on January 23, 1980.

12.     Petitioner filed an Application for Certificate of Probable Cause to

Appeal to the Georgia Supreme Court.  The Court denied the petition on March

19, 1980.

13.     Petitioner timely filed a Petition for Writ of Certiorari in the United

States Supreme Court which was denied on October 6, 1980.  *Presnell v. Zant,* 449

U.S. 891 (1980).

14.     Petitioner filed his first federal habeas petition on June 15, 1981, in

the United States District Court, Northern District of Georgia.  The petition was

dismissed without prejudice for failure to exhaust state remedies on January 13,

1984.  *Presnell v. Zant.* U.S.D.C., N.D. Ga. Case No. 81-1149A

15.     Petitioner filed a Petition for Writ of Habeas Corpus in the Superior

Court of Butts County on January 24, 1984.  This petition was denied on

September 6, 1984.

6

16.     On May 15, 1985, petitioner filed a subsequent petition for writ of habeas corpus in the northern district of Georgia.  On March 26, 1986, the district court vacated Petitioner's death sentence due to an improper burden shifting instruction. *Presnell v. Kemp*, U.S.D.C., N.D. Ga.,Case No. 85-2934A.

17.     The Respondent appealed to the Eleventh Circuit Court of Appeals, and on January 11, 1988, the Eleventh Circuit reversed the decision of the district court and remanded with instruction.  Rehearing *en banc* was denied on July 25, 1988. *Presnell v. Kemp*, 854 F. 2d 1326 (1988).

18.     A Petition for Writ of Certiorari to the United States Supreme Court was denied on January 23, 1989.  *Presnell v. Kemp*, 488 U.S. 1050 (1989)

19      On July 11, 1990, the United States District Court again reversed petitioner's death sentence due to an improper closing argument by the prosecutor in the sentencing phase of the trial, and denied relief on all other grounds *Presnell v. Zant*, U.S.D.C., N.D.Ga. 1-85-CV-02934-RLV.

20.     Respondent appealed to the Eleventh Circuit Court of Appeals, and petitioner cross-appealed.   The Eleventh Circuit affirmed the district court's grant of relief with respect to the death sentence. *Presnell v. Zant*, 959 F  2d 1524 (11th Cir. 1992).

7

21.    Following a resentencing trial, Mr. Presnell was again sentenced to death by a Cobb County jury. The date of the resentencing was March 16, 1999.

22     Petitioner appealed his resentencing verdict. The facts of petitioner's appeal from his resentencing proceedings are as follows:

(a)    The Supreme Court of Georgia affirmed petitioner's resentencing verdict on July 16, 2001. *Presnell v. State* 274 Ga. 246, 551 S.E. 2d 723 (2001)   Reconsideration was denied on September 19, 2001

(b)    Petitioner timely filed a Petition for Writ of Certiorari in the United States Supreme Court. Certiorari review was denied on May 13, 2002   *Presnell v. Georgia*, 531 U.S. 1196 (2002).

23     On October 16, 2002, Petitioner filed a petition for writ of habeas corpus in the Butts County Superior Court. An evidentiary hearing was held on June 2, 2004.

24.    Following an evidentiary hearing, the Superior Court of Butts County denied Mr. Presnell's Petition for Writ of Habeas Corpus on December 30, 2005.

25.    Petitioner timely filed his Application for Certificate of Probable Cause to appeal to the Georgia Supreme Court on March 30, 2006.

26.    On November 6, 2006, the Georgia Supreme Court denied Petitioner's Application for Certificate of Probable Cause to Appeal.

27.    There are no other petitions, applications or motions pending with respect to these convictions and sentences. Petitioner has been convicted and sentenced to death in violation of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

## II. INTRODUCTION

Over fifty years ago, Virgil Presnell was born into a life of poverty, physical and sexual abuse, and severe mental illness. The circumstances which Mr. Presnell endured throughout his childhood would have profoundly challenged even the most resilient, skillful and savvy among us; but they were utterly devastating for Mr. Presnell, for he came into the world particularly ill-equipped to handle the enormous stresses and handicaps brought on by these factors

This is so because Mr. Presnell's mother Lois, a teenage mom who was herself substantially mentally impaired, drank and smoked heavily throughout her pregnancy with Mr. Presnell. As a consequence, Mr. Presnell was born brain damaged from a condition known as fetal alcohol syndrome.

Fetal alcohol syndrome can have far ranging and devastating consequences for anyone unfortunate enough to be inflicted, but for Mr. Presnell, the disease and

9

its symptoms were the tip of the iceberg, and they exacerbated the impact of the debilitating conditions that marked his surroundings. All of this would cripple Mr. Presnell's capacity for "normalcy," however one may reasonably understand that term. In short, Virgil Presnell was fated at birth from ever developing into a functioning, responsible adult.

It is widely known, and has been for many years, that fetal alcohol syndrome is highly correlated with a number of consequences, including mental retardation, extremely high incarceration rates, low achievement and performance in school, and notably here, sexually deviant behaviors. And so it was with Mr. Presnell.

Fetal alcohol syndrome would come to affect every aspect of the brief life Mr. Presnell had in the free world, before he was incarcerated for the crimes for which he now faces a sentence of death. The syndrome left him severely disabled both physiologically and psychologically, and permanently equipped Mr. Presnell with the mind, judgment, impulsivity, and emotional development of a child under the age of ten. Coupled with a childhood marked by ongoing violence, alcoholism, and sexual and physical abuse, it is not at all difficult to see how he developed into an adult with serious disturbances which, left un-checked and un-treated, could produce tragic results.

This is not to say that it is possible, or even advisable, to absolve an individual from *all* responsibility for behaviors in adult life (in fact Mr. Presnell was only nineteen at the time of the crime and far younger in mental age), so long as a person is basically competent and sane. But it takes no great leap to appreciate the moral necessity of mitigating Mr. Presnell's accountability, even for acts as tragic as those in this case, in direct proportion to the degree to which his actions and decisions were the product of a diminished mental capacity caused by factors beyond Mr. Presnell's power to control or change.

Any homicide is horrible; but the killing of a young girl, coupled with sexual trauma, is perhaps one of the hardest to comprehend and therefore the least likely to mitigate in the sense of evoking any feelings of mercy towards the perpetrator. Mr. Presnell's trial attorneys, Steve Schuster and Mitch Durham, were well aware of these difficulties. From the defense point of view, then, Mr. Presnell's re-sentencing trial had to focus the jury's attention on a thorough, well-documented, and fully investigated presentation of a story about Mr. Presnell which would not excuse his conduct, but would help the jury to understand it in a way that avoided the imposition of an ultimate judgment befitting only a fully functioning and responsible adult. This is, according to the accounts of both

attorneys, exactly what they set out to accomplish. None of the above is in controversy

Also indisputable is the fact that, though faced with the above-conceded task, Mr. Presnell's trial attorneys determined to approach it by passing on all responsibility for the mitigation investigation onto the mitigation specialist they had hired to assist them, Toni Bovee. Ms. Bovee herself admits, however, that she entered the defense team late in the game, and conducted only a scant few interviews which were cursory and largely unhelpful. She admits that she failed to contact, let alone interview, scores of family members who, as was determined in the state habeas proceedings, were the source of substantial critical information about Mr. Presnell and his past. She admits that she never asked *anyone* about maternal drinking during the pregnancy  And importantly here, counsel readily admitted that they themselves spoke with no one other than persons directed to them by Ms. Bovee. In short, Mr. Presnell's trial attorneys relied upon Toni Bovee exclusively for developing whatever facts about Mr. Presnell they were to use in the sentencing trial. Above all else, that simple fact of delegating all investigative responsibility to another who, due to insufficient knowledge, time, focus, or whatever else, did not conduct a proper investigation in this matter, explains why the jury that chose to condemn Mr. Presnell never saw the true

picture of who he was and what life circumstances could have brought him to the place he was on the day of this tragedy.

This investigative failure also undermined the defense's ability to present solid, reliable expert testimony about Mr. Presnell's mental and emotional illness. The defense expert used at trial was left with little to utilize in explaining how the conditions in which Mr. Presnell was raised impacted Mr Presnell, and why those conditions were particularly damaging to a young boy whose brain was damaged as a result of his mother's pre-natal alcohol ingestion.

Consequently, when the defense attorneys put on the case for life, despite their admitted desire to develop and present precisely the kind of poignantly mitigating story set infra, all they could muster was the portrait of a diagnosed pedophile (itself of questionable mitigating value) who would accommodate well to a life in prison   While a couple of the closest family members testified at trial (Mom, Aunt, and a son and stepfather who had never met Mr. Presnell before he went to prison), notably absent from their testimony and the entire defense presentation was any mention of, let alone exploration about, what we now know to be true, namely:

○ that Mr. Presnell's brain was and is deformed due to his mother's pre-natal activities;

13

○ that Mr. Presnell suffers from a readily diagnosed condition known as fetal alcohol syndrome, and its effects;

○ that it is well documented that those effects include precisely the kind of behaviors, actions and outcomes which inflicted Mr. Presnell and which the defense sought to mitigate; and therefore,

○ that this disease was directly linked to adult behaviors that might otherwise appear merely sinister and incomprehensible, in equal measure.

All of this, because· a) the attorneys passed on all responsibility for the investigation and development of facts to an investigator who, b) either did not understand the importance of asking Mr Presnell's mother about pre-natal drinking and of developing a full and complete social history, or did not have the time to do so, or both, and who therefore, c) failed to contact numerous crucial witnesses, and failed to interview the few that were contacted about critical facts which explain how and why Mr. Presnell could have been connected to such a tragedy.

Whatever the ultimate explanation, one thing that is certain is that the defense's failure to investigate, develop and present this crucial information to the jury was not the result of strategy. Both attorneys readily admit that, had they become aware of all of these facts about Virgil Presnell (which are only briefly

14

summarized above but are more fully detailed in the testimony produced in state court[1] and incorporated herein by express reference) they would have utilized them to the fullest by presenting them to the jury and expounding upon them at length in their case for mercy.  Had they done so, at least one juror would have been persuaded to vote for a sentence of life imprisonment.

The state habeas court found, with one exception, that the claims presented below were either procedurally barred for failure to assert in prior proceedings, res judicata, successive, or non-cognizable in a habeas proceeding   Petitioner asserts that many of these findings were in error and contrary to established Supreme Court precedent and that the court further erred by failing to independently evaluate trial counsel's ineffectiveness with respect to each claims.[2]

The only claim considered on the merits by the state habeas court was the ineffective assistance of counsel claim.  For reasons asserted more fully herein, Petitioner submits that the lower court rendered factual findings not supported by the record and legal conclusions which are incorrect in light of well-established Supreme Court law in resolving Petitioner's claims.

---

[1] The record from the state court will be provided to this Court by Respondent.

[2] Petitioner asserted a claim of ineffective assistance of counsel with respect to each claim, as state habeas was his first opportunity to litigate the inffectiveness of his resentencing counsel.

15

### III.  CLAIMS ENTITLING PETITIONER TO RELIEF

### CLAIM I

**PETITIONER RECEIVED CONSTITUTIONALLY DEFECTIVE ASSISTANCE OF COUNSEL AT ALL STAGES OF THE PROCEEDINGS, IN VIOLATION OF THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.  THE STATE HABEAS COURT ERRED WHEN IT INCORRECTLY FOUND THAT PETITIONER RECEIVED THE EFFECTIVE ASSISTANCE OF COUNSEL.**

1.      All other Claims and facts in this Petition are incorporated into this claim as if specifically pleaded herein.

**A.      The Habeas Court Erred In Finding This Claim Meritless.**

2       In denying this claim, the habeas court found that trial counsel's actions were "made in the exercise of reasonable professional judgment."[3] This ruling both fails to address and is contrary to trial counsel's unrebutted testimony that they had no strategic nor tactical reason for failing to present the substantial mitigation evidence provided by lay witnesses and mental health experts offered in state habeas, and that such evidence was entirely consistent with their theory of defense.  Further, by simply not addressing

_____

[3] State Habeas Final Order, p. 44.

16

trial counsel's failure to obtain any social history or to interview any of the paternal family members, the habeas court sidesteps Supreme Court law demanding that trial counsel conduct a full inquiry into Petitioner's background, including but not limited to family and social history. *See Wiggins v. Smith*, 539 U.S. 512, 524 (2003); *see also Rompilla v Beard*, 545 U.S. 374, 125 S.Ct 2456, 2465-2466 (2005).

3.    In addressing the prejudice prong of *Strickland*, the habeas court addressed in great detail the evidence submitted at the trial, but failed to evaluate any of the evidence presented during the state habeas.[4] The court simply held that "much of the information gathered and presented    . is cumulative" and that "the information contained that is not cumulative does not rise to the level of Constitutional concern."[5] As is argued in this petition, and more fully in pleadings in the state court below (incorporated herein by specific reference), this finding is clearly erroneous and is not supported by the evidence. Additionally, this finding is contrary to long-standing United States Supreme Court law addressing the types and kinds of mitigating evidence that should be considered at trial.

---

[4] *See* State Habeas Final Order, pp. 34-44.
[5] *Id.* at 43-44

**B. Trial Counsel Provided Constitutionally Defective Assistance**

**1) Failure to Thoroughly Investigate and Produce a Social History.**

4.    Any adequate capital sentencing investigation requires, at a minimum, the

development of a full and complete picture of the defendant, his or her

background, and any identifiable mental, medical or other disabilities that

may help to explain the defendant's particular actions and behaviors which

led to the death-eligible offense. *See Williams*, 529 U.S. at 396, *Wiggins*,

539 U.S. at 522. This picture starts with the creation of a complete and full

social history. A "social history" is a specifically defined term in the mental

health profession: it is a report or document which collects all known

sources of information (documentary or in-person) about an individual, and

weaves them into a coherent understanding of all of the forces and factors

that play a significant role in a person's adult personality. By definition the

completion of a social history therefore requires an extensive investigation

into all such sources of information   It starts with collecting so-called

"primary" documents (school, medical, social services, employment and

other records), and moves through a series of in-person interviews with

family members, neighbors, teachers and school officials, co-workers,

friends, ministers, and all other persons who may have had any significant

18

interaction with, or knowledge of, the defendant and/or his or her

surroundings during the period in which he or she developed from

childhood, through adolescence and into adulthood  The United States

Supreme Court has expressly recognized the critical importance of such an

endeavor, noting that capital mitigation investigation requires utilization of

a specialist trained in the investigation and preparation of a complete social

history *as a starting point* to the preparation for a capital sentencing trial.

*See Wiggins v. Smith*, 539 U.S. at 523-24.[6]Trial counsel here admitted that

they failed to develop on their own, or have either an investigator or an

expert develop, a full and complete social history of Virgil Presnell.  Such

---

[6] "The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).  Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources  Cf. *id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added to quote by Court opinion), 1 ABA Standards for Criminal Justice 4-4 1, commentary, p. 4-55 (2d ed. 1982)("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing . .  Investigation is essential to fulfillment of these functions").  *Id; see also Rompilla*, 545 U S. at 386-387.

failing undermined the entire defense, not only because of the specific facts about Mr. Presnell never discovered during the course of the investigation (most notably maternal drinking while he was *in utero* and all the implications arising therefrom), but also because of how, as a consequence, the defense team never developed even a basic understanding of who Virgil Presnell was and how he came to the place he did when he was arrested for the offense   In short, the defense failed to engage in a basic investigative operation which the United States Supreme Court has held is *critical* to effective representation under the Sixth Amendment at the sentencing phase of a capital trial.  That fact alone warrants a finding here that counsel was ineffective.

5   Had counsel taken the step of ensuring that a full social history was compiled by them or their mitigation specialist as the ABA Guidelines require, *see Wiggins, Williams,* the information set forth *infra* (which was largely overlooked by trial counsel) would have been uncovered and readily available for presentation at Mr. Presnell's re-sentencing trial.  There is little question that such a presentation would have convinced at least one juror that Mr Presnell's life was worth sparing despite the tragedy caused by acts of which he had been previously convicted.  That fact alone warrants a

finding that counsel's ineffectiveness prejudiced the outcome and requires

the granting of habeas corpus relief.  That this is so is perhaps best

demonstrated by a review of the highlights of the social history produced

and provided in state court proceedings below.

6.    Habeas counsel retained a trained social worker with a MSW in social work

(S.H.T. 2392) who developed and provided in the state habeas corpus

proceeding a complete social history that was admitted in full and wholly

un-rebutted by the State of Georgia.  This social history is supported by

testimony from witnesses, interviews with Mr. Presnell, mental health

evaluations, and documentary evidence pertaining to Mr. Presnell's life and

his capital case.  The social history begins with the following overall

conclusions

> [A] unique set of factors contributed to Virgil's social
> functioning, intellectual development and behavior.
> These factors, which all have mental health
> consequences include:
>
> a.    Virgil has fetal alcohol syndrome, a factor
>       which affected his emotional, social and
>       intellectual development, his behavior, and
>       which, perhaps as much as any other factor,
>       helps to explain his conduct throughout his
>       childhood and up to the days leading to the
>       offense for which he is currently on death row.

b.  Virgil was born into poverty and grew up in the first housing projects in the United States where he was exposed to lead paint. His family was constantly moving throughout Atlanta. When they could not pay the rent, they would move from place to place, mostly public housing

c.  Both Virgil's paternal and maternal families have a significant history of mental illness, mental retardation, and cognitive impairments. This is important to an understanding of Virgil's genetic, physical, and emotional make-up.

d.  Virgil has limited intellectual capabilities and marked adaptive behavior deficits.

e.  Sexual abuse and dysfunction characterize the family setting in which Virgil was raised. Both Virgil's paternal and his maternal families have been victims and perpetrators of sexual and physical abuse. Virgil was a witness and victim to much of this sexual and physical violence.

f.  Virgil's maternal and paternal family played important roles in Virgil's upbringing. His family history is important to understand how his families' values and behaviors were shaped.

g.  The prevalence of alcoholism in Virgil's paternal family is widespread  Alcoholism contributed to the violence, chaos, and rejection that characterized Virgil's life.

h.  Virgil's father abandoned him as a child. Virgil was always searching for the father figure that he did not have. His father later come back into his life and derogated him for his limited intellectual capabilities

S.H.T. 2395-2396.  The social history highlights how lacking in facts, depth and focus was the story provided to the jury by Mr. Presnell's trial lawyers

7.    In that regard, one of the areas completely neglected by the trial defense team was the paternal side of Mr. Presnell's family.  To repeat the remarkable: *no one from the defense team ever contacted any family member from Virgil's father's side of the family.*  That fact alone stands in stark contrast to the Supreme Court's clear admonition in *Wiggins* that counsel ensure that a full and thorough family history investigation be conducted in every capital case.  All the more true here, in light of the nature of this case, the limited facts that were uncovered by the defense, and the basic standard of practice in capital mitigation investigations at the time the case was tried.  And of course any person trained in the mental health professions generally, and in social work in particular, will readily acknowledge the critical importance of obtaining all life history information on *both* sides of a person's family.  The social history obtained through a thorough investigation in post-conviction shows there was a wealth of

available information that was crucial both to a proper diagnosis of Mr. Presnell's disabilities as well as to a full understanding of his history and social development. Paternal family members (who were never contacted by anyone on the defense team) testified in depth in the habeas court about dysfunction in the extended paternal family which directly impacted Mr. Presnell. S.H T. 2434-2435. 2445-2446, 24467-2468, 2469, 2472. This dysfunction included. but was not limited to, physical and emotional abuse to Mr. Presnell from his father, a family history of alcoholism, physical and emotional abuse of his mother by his father in Mr. Presnell's presence. his father's sexual abuse of Mr. Presnell's sister, and a family history of poverty  *See Id.*, S.H.T 2396-2399.

8.    As for the mother's side of the family, the trial investigators interviews were so cursory, and limited to only a very few individuals (many of whom were the *source* of some of the most severe of Mr. Presnell's mental and psychological problems), that the defense completely missed the most important aspects of Mr. Presnell's childhood  Unlike the testimony presented at trial,

which only provided a cursory examination of Mr. Presnell's childhood, the state habeas testimony provided a detailed intricate picture of his severely chaotic childhood, which was marked by improper and unclear relationships with the women in his life, male role models who exhibited inappropriate behaviors around Mr. Presnell, the presence of several sexual deviants in Mr. Presnell's life, the disruptive nature of his parents' relationship, pervasive violence, and perhaps most significantly, the critical facts surrounding the mother's prenatal drinking while pregnant with Mr. Presnell. *See* S.H.T. 2399-2401, 2430-2431, 2438-2439, 2443-2444, 2447-2458, 2459-2464

9.   The failure to produce a social history also resulted in the overlooking of significant positive facts about Mr. Presnell's kind and gentle disposition as a child, facts which also would have aided the jury in seeing him as something other than an adult predator unworthy of mercy  These facts were confirmed by witnesses who knew Mr. Presnell as an adult, who were available to testify and informed defense counsel of that fact, but were never contacted by counsel. *See* S.H.T. 2425-2429.

25

10. The father's influence on young Virgil Presnell cannot be
    overstated, and yet the defense completely ignored this aspect of
    Mr. Presnell's life.  Instead, defense counsel simply relied upon
    Ms. Bovee's cursory interviews with a few of the maternal family
    members to provide the mitigation picture.  Additionally, the
    defense never connected Mr Presnell's "adult" behaviors,
    including criminal ones, with the events of his childhood.  Thus
    the jury was left with a view of Mr Presnell as a pedophile with
    no real redeeming qualities, a view that undoubtedly resulted in
    his sentence of death.

11. Virgil Presnell's story cannot be accurately told without reference
    to his clear mental impairments.  Prominent among these features
    was the fact that he was slow, that he performed poorly in school,
    and that he was always better suited being with children much
    younger than he was owing to his mental deficiencies.  Although
    not difficult to document, owing to the cursory nature of the
    investigation, the defense never learned how Mr. Presnell was
    always a follower, was uncomfortable around older children, and

was most at home playing with kids far younger than he because

of his true "mental age." *See* S.H.T. 2417-2419.

12.     While the defense obtained some school records for Mr. Presnell,

the superficial investigation failed to produce information

regarding the extent of his mental deficiencies and its impact on

his mental and social development·

> Virgil entered Luckie Street School in
> the fall of 1958 for kindergarten.  He remained
> in the school for two months and then he
> entered Couch elementary because his family
> was forced to move.  He finished the year at
> Couch but, because of academic and emotional
> delays, he was not promoted to first grade.  He
> then repeated kindergarten at Couch, but his
> family moved again and he returned to Luckie
> Street Elementary.  The family then moved
> again and he attended Lena Cox Elementary
> School where he finished kindergarten and was
> promoted to first grade in March of 1969.  In
> this way, the first year of his school life told
> much about Mr. Presnell and his childhood:
> his obvious cognitive impairments, the family
> instability, and the chaos inevitably generated
> by his having gone to kindergarten for two
> years while changing schools three times.
>
> Virgil was again retained, this time in the
> first year grade, and after the second time
> through first grade was promoted to the second
> grade.  The family moved again in the summer
> of 1963 and Virgil started third grade at JC
> Harris Elementary and he was placed into

27

fourth grade in the fall of 1964.  The family again moved, back to the housing projects, and Virgil started the fourth grade once again at Luckie Street Elementary.  Virgil completed fourth grade in one year.  During his fourth grade year it was recommended that Virgil attend the Child Guidance Clinic but his mother said that she was too afraid to bring him to the clinic.  Virgil then took two years to complete fifth grade.

In the spring of 1966 Virgil's teacher referred him to the Atlanta Public Schools Department of Psychological Services   Vigil discussed his parent's marital problems with the counselor who assessed him.  The counselor suggested that a social worker follow up with the family because of the discussion he had with Virgil.  In the fall of 1967 Virgil entered 6th grade   On April 27, 1967 Virgil was given the California Test and obtained an IQ score of 67   In the fall at the end of his sixth grade year he was placed into eighth grade because the principal at the elementary school did not feel that it was appropriate for a 15-year-old to still be in elementary school.

At this time a psychological evaluation was also conducted on Virgil, in February of 1969.  Psychologist Dorothy Swindell found that Virgil was "functioning at the upper limits of the mentally defective level of intelligence and performing several years below grade level academically".  It was also found that Virgil is "poorly adjusted both personally and socially".  Virgil reported to the examiner that his parents "think I am stupid"   Ms  Swindell suggested that Virgil be placed in an "EMR Class" where Virgil could receive special help and be given

> coursework more suited to his ability. She also
> suggested that Virgil's parents needed to accept
> his limited academic ability instead of
> derogating him for his lack of academic
> achievement.
>
> Dr. George Preston, M.D., Director of
> Psychiatric Services, also saw Virgil at the
> Child Guidance Clinic because of Virgil's poor
> academic performance, and because of his
> truancy during his eighth grade year. On April
> 10, 1969 Dr. Preston suggested that Virgil be
> placed in an educationally oriented class for the
> mentally retarded   The Atlanta Public Schools
> also made a referral to social services because
> of Virgil's truancy problems in the spring of
> 1969   It was suggested that Virgil and his
> family attend the Child Guidance Clinic, but
> Virgil's parents did not follow through until the
> fall of 1969 when Virgil was already getting
> into legal trouble. At this point Virgil dropped
> out of school, never to return. At the time he
> was in the eighth grade.

S.H.T.  2415-2417.

13    While the defense conceded that Virgil was not mentally retarded,

there was considerable information available that would have

demonstrated that he was "functionally" retarded even though his

test scores in later life failed to establish the MR diagnosis.  The

evidence of so-called "adaptive behavior deficits," a critical

component of a diagnosis of mental retardation, is overwhelming,

29

yet the defense completely missed these facts because of the

limitations of the investigation conducted.

Virgil has been described by all who
knew him as a person who was always "slow"
His mother describes said he was "slow to
learning." which she also states about herself.
His half-sister Wanda, as well as his son, Brian
Terry, speak about letters that Virgil wrote to
them over the years.  At times Wanda could not
even understand what Virgil was writing about
because of the misspellings, grammatical
errors, and incomprehensible content.  Brian
had difficulties reading his father's letters
because of the misspelled words.  Brian also
recalls that his father's letters were usually
filled with small words and short sentences.
Others describe how Virgil would usually take
a long time to get his thoughts together in a
coherent way   It would usually take much
patience to listen to and speak with Virgil, as
he would often take a long time to explain a
simple story; at times he would forget what he
was talking about in the middle of the story.
Virgil would often act on impulse as a child
He would not plan before he acted, even when
it was clear that some planning was needed
The story regarding Virgil's impulse camping
trips, even after he was old enough to drive,
exemplify this point
People describe how, when talking with
him, Virgil often appeared unable to follow
what was being said.  Also, as noted, Virgil
would hold his mouth open in a blank stare
when people were talking to him.  Deborah
even thought that Virgil might need a hearing

aid because he would not respond to her at times when she was talking to him. Virgil could only focus on one thing at a time. He also had a difficult time following orders or taking and following directions from his family.

Virgil would become anxious when confronted by authority figures. As a child he would cow down to his mother because he was scared of her. As he got older his nerves would act up at work when his older co-workers confronted him.

Virgil was also *eager to please others* He would do whatever anyone asked him to do. He also did things to get people to like him and to make people laugh. Even when playing with younger children Virgil always did what they wanted to do. He would just follow along with what people wanted him to do   This behavior eventually got Virgil into trouble. His father and other older men asked Virgil to steal for them and Virgil would do it because he wanted to be accepted by the only men that he knew Similarly Virgil was gullible, and older kids could and often did easily take advantage of him.

S.H.T. 2417-2419.

14.   One of the most significant problems with the defense's failure to

obtain a complete family social history was the fact that such a

history would have presented a strong case for familial pre-

disposition to mental health issues of the sort from which Mr.

31

Presnell suffers.  These included mental deficiencies, alcoholism,

and addiction issues.

> Both the Edwards's and the Presnell's
> have members of their family that have mental
> health problems, mental retardation, and
> cognitive impairments.  Virgil's maternal
> grandfather has been described as "slow and
> mental" by many that knew him.  Virgil's
> mother appears to have adaptive behavior
> deficits and her school records show a limited
> intellectual capacity.  Lois has been described
> as someone that you have to repeat orders or
> directions to.  She has also been described as
> someone that had trouble developing close
> interpersonal relationships.  Lois's brother,
> James Edwards, was also diagnosed with
> mental illness when he was a child
> At age 16 Lillian Shepard had a
> breakdown and was seen by a psychiatrist at
> Grady Hospital for six months.  Lillian
> acknowledges that she was nervous all the
> time.  At times her nervous condition was so
> severe that she would not even cross the street
> by herself, and she often too scared to go to
> school  She never returned to school after
> being seen at Grady Hospital at age 16.  Peggy
> McQurter was also in a psychiatric ward for
> several days in her late twenties.  Peggy's
> daughter Belinda Saunier has anxiety problems
> and has been on medication in the past to deal
> with her nerves.  Lillian's daughter Pamela
> was also diagnosed with bi-polar disorder
> Lois' Aunt Elizabeth Rumph committed suicide
> when she was 23 years old in Cordele, Georgia.

Virgil's half-brother Jimmy Presnell was
diagnosed with mental retardation   He was in
special education classes throughout his school
years.  His brother Larry Presnell was also in
special education classes because he had a
learning disability.  Both Jimmy and Larry
were held back in school for several years.
Jimmy and Larry both dropped out of school;
neither was able to hold down a job.  Wanda
Louise Boling suffered from major depression.
She was diagnosed after an attempted suicide
in 1963.  She was on medication until she died.

Virgil's paternal family has a long
history of drug and alcohol abuse  Virgil's
paternal grandparents, Curly and Iva, were both
alcoholics. Virgil's father Delano was an
alcoholic; he currently suffers from bouts of
alcoholic dementia.  Delano's brother Clarence
is also an alcoholic. Delano's two sons William
James (Jimmy) and Larry both abused drugs
and alcohol  Larry died at a young age from
cirrhosis of the liver.  Delano's sister also
abused prescription pills until her death

Virgil's mother's family also has a
history of drug and alcohol abuse. Virgil's
Aunt Peggy was an alcoholic and Brenda
abused drugs. Virgil's cousin Donald is also a
recovering drug addict, and Virgil's cousin
Maria Wilkerson is an alcoholic.  Lois's
cousins Leon and Sonny Calloway were also
drug addicts and they were known to do crazy
things when they were high

S H.T. 2419-2420.

15.  Of course a critical theme in the case was that of sexual abuse and predation. The defense handled the matter by labeling Virgil a "pedophile" without any serious attempt to delineate its root causes.  Any such attempt was also severely constrained by the lack of available factual background, again owing to the lack of a full social history.

> Many of Virgil's family were both victims of sexual abuse, as well as were individuals that abused others.  On the Presnell side of the family, from what was able to be learned, the sexual abuse went back at least to Curly.  Curly repeatedly raped his daughter Wanda Louise  His son, Delano (Virgil's father), then molested his own daughter Wanda Graves.  Jimmy Presnell (Virgil's half-brother), is in prison for child molestation.
>
> Several family members have reported that Virgil's maternal grandfather, Cleo Edwards, molested several of his grandchildren, including his granddaughters Belinda Saunier and Vicky Duron.  Cleo's son James Edwards, Virgil's uncle, molested his own  sisters, Lillian and Brenda, and attempted to molest his others sisters, including Lois, Virgil's mother.  James Edwards was also convicted of molesting his own daughter and forcing his son to have sex with his wife (the son's mother).  He served several years in the Georgia state prison system for these convictions.  (Ironically, the prosecutor who handled James Edwards's molestation case in

Fulton County, Georgia, Russell Parker, was also the prosecutor who handled Virgil's 1999 retrial in Cobb County.)   Lillian's father's best friend also molested Lillian Shepard when she was a child   Lois Samples was almost raped by the son of the owner of one of their rental properties that she and her family lived in. Before her death, Peggy McQurter told Lois that Delano tried to touch her when Delano returned from Japan. Peggy was a teenager at the time.

\*     \*     \*

As noted, Lois's brother James Edwards served prison time for having sex with his daughter and forcing his son to have sex with his mother. Prior to this James's children were removed from his home for neglect, but they were returned to he and his wife. Eula Edwards's sister's son murdered his wife, his sister, and then himself. This occurred sometime in the 1960's.

S.H.T. 2420-2421.

## 2)  The Cursory Investigation Conducted by the Trial Investigator.

16   As noted, the above failures in the defense investigation resulted

from the cursory mitigation investigation conducted by Ms.

Bovee.  Trial counsel, though clearly responsible under the law for

ensuring that such investigation was conducted, delegated the task

entirely to Ms  Bovee. Even a brief review of her unrebutted

35

testimony reveals the limited nature of the work she performed in this case. The first time she even spoke with the defense team was many months after their appointment to the case, and only three months before trial. S.H.T. 2491. From the outset her role was somewhat ill-defined, as she herself states that she was hired not only to "interview and prepare mitigating witnesses for the sentencing trial" but also to "assist in the jury selection." *Id.*

17   Critically here, however, she admits under oath that to fulfill the investigation part of her duties, she did the following: "I interviewed Lois Samples, Willie Samples, Peggy McQurter, Lillian Shepard, Debra Washington (Gilliland) and Brian Terry. *These are the only persons with whom I spoke as a part of my mitigating investigation.*" *Id*

18.   With respect to a key issue for these proceedings, that of Virgil's Fetal Alcohol Syndrome, Ms. Bovee never once even mentioned the subject of maternal drinking while pregnant with Virgil to Virgil's mother. *See* S H.T. 2464. This is so despite the fact that Ms Samples readily acknowledged that had anyone prior to Virgil's re-sentencing trial asked about the subject, she would

have told them everything she told state habeas counsel as
contained in her affidavit. *Id.*

19.   In other words, the entire investigation of this case performed by
defense counsel (through their appointed person, Toni Bovee),
consisted of speaking with six people, two of whom had never
known Virgil before he went to prison, none of whom were from
the father's side of Virgil's family, and one of whom was herself
the key cause of Virgil's Fetal Alcohol Syndrome. That is it; that
is the sum total of the mitigation investigation conducted for
Virgil Presnell, in a proceeding in which the *only* issue was
sentence, and in which counsels' *only* significant duty was to
make the case for life through the investigation, development and
presentation of mitigating information to the jury. That single
fact, standing alone, warrants a finding that counsel was
ineffective.

20.   Ms. Bovee readily admits all that she did not do. "I did not talk to
Belinda Saunier, Donald Tweed, Don Casper, Peggy Casper,
Dorothy Atkinson, Wanda Graves, Virgil Presnell, Sr., Harry
Blondheim, James Edwards, Jewell Scott, Deborah Gilliland,

Clarence Presnell, and Willie McGee "S.H.T. 2491. And this was
not because she had pre-determined that these persons would be
un-useful in their information. Indeed, having reviewed the
affidavits of family and friends obtained by habeas counsel,
including those of the above-listed individuals, *see* S.H.T. 2425-
2474, incorporated herein by express reference, Ms. Bovee states
that "[w]ith respect to [these affidavits], the kind of information
contained in these affidavits was exactly of the type I was hoping
to find for use as mitigating evidence at Virgil's sentencing trial.
Had I interviewed these witnesses and obtained this same
information, I would have provided it to the defense attorneys and
would have encouraged them to present their testimony to the jury.
With respect to the information contained in the affidavits of those
persons listed [above], much of this was also information which I
would have wanted to bring to the attention of the trial attorneys,
and would have encouraged them to present at trial." S H T. 2491.

21.    Ms. Bovee was both clear and candid in her acknowledgement that
her failures were not the result of strategy or any limitations
placed upon her by counsel or other circumstances  "I recognize

38

that many of the affidavits provided to me by current counsel contain very useful and important information about Virgil's limited intellectual abilities and his childlike nature. I did not interview these people and had I done so, and obtained the information set forth in their affidavits, I would likewise have provided it to the attorneys and, once again, encouraged them to use it at sentencing, as well provide it to mental health experts for consideration in any mental health evaluation and assessment."
*Id.*

22. And *importantly here, especially in light of Wiggins,* Ms. Bovee admits that she never conducted, drafted or prepared a social history "I *did not write a social history report for Virgil Presnell and his family but gave attorney's information verbally and in writing regarding the people I spoke to* " *Id.*

## 3) Failure to Marshall and Inform Necessary Expert Assistance.

23. As noted, the defense failures in the investigative arena crippled the remainder of their preparation for trial. Importantly, these failures both caused counsel to overlook the need for certain experts, and rendered the expert they did hire completely

39

unequipped to present the compelling case for life that would have been available had defense counsel done their job.

### (a) Failure to Retain An Expert in Sexual Abuse and Deviance.

24.   The defense never considered hiring an expert specifically in sexual predation and sexual abuse. This fact is of course striking, given both the nature of the crime and the allegations the defense had learned through their meager investigations regarding Virgil's upbringing and the sexual dysfunction in the family. Had the full social history been done, and thus the extent of the sexual abuse history in the family (on both sides) been known, it would have become even clearer to the defense that an expert with this particular specialty would be needed.

25.   Dr. David Lisak, who testified in the state habeas proceedings, is such an expert. Dr. Lisak is a clinical psychologist and associate professor of psychology at the University of Massachusetts Boston. For nearly two decades he has conducted research on the causes and consequences of interpersonal violence perpetrated by men. Specifically Dr. Lisak has focused his studies on the long

term impact of childhood sexual and physical abuse on male development. S.H.T 2350-2391. Dr. Lisak, or someone of comparable credentials and background, could have been a critical witness for the defense in a case such as this, and yet owing to their minimal investigation, trial counsel never fully appreciated the need for such help. Dr. Lisak reviewed extensive documentary materials about Mr. Presnell, as well as transcripts from his trials, to address the questions of whether additional, potentially mitigating evidence might have been offered related to the description of Mr. Presnell as a "pedophile." S H.T 2350-2354.

26. Without a doubt, a diagnosis of pedophilia is a double edged sword. Thus, it is critical that the jury gains a full understanding of the etiology and the history of the illness from a credible, informed source. Dr. Lisak's description of Mr. Presnell's childhood traumas and explanation of how these "place Mr. Presnell squarely within the parameters of the cycle of violence research." would have provided the jury with the full understanding of Mr. Presnell's history and how it impacted his actions and this crime.

41

The development of pedophilia in any
individual results from the intersection of many
interacting variables. These variables are
typically referred to as "risk factors," because
research has shown that they are associated
with the development of pedophilia. The more
risk factors an individual has, the more likely
are they to develop pedophilia. The concept of
"risk factors" would have been one way to
present the evidence relating to Mr. Presnell's
childhood traumas and other adverse
circumstances  Below are outlines of what
could have been presented
Developmental Delays and Probable Brain
Damage
Based on the records available to me, it
is clear that Mr. Presnell suffered from very
serious developmental delays that affected both his cognitive and emotional dev
therefore also his social and interpersonal functioning. I understand that
further neuropsychological testing is currently being done to determine
whether Mr. Presnell meets the formal criteria for mental retardation, and
also to pinpoint his neuropsychological deficits. Regardless of the
outcome of this testing, the records make it clear that Mr. Presnell was
severely impaired, such that his cognitive, emotional and social age was
far lower than his chronological age, and that his ability to reason and
make appropriate judgments was impaired

Cognitive and emotional development is
in fact a product of progressive development of
neural pathways, primarily in the cortex, that
enable a child to inhibit and channel their
impulses in appropriate ways (i.e., verbally), to
delay gratification of needs, and to understand
the complex verbal and nonverbal cues that
make up social interactions. A child whose
neural development is delayed becomes
increasingly vulnerable to a host of bad
outcomes. depending largely on the relative

42

balance of positive vs. negative and abusive elements in his environment. In the case of Mr. Presnell, his severe developmental delays greatly amplified the impact on him of the abusive and deviant aspects of his environment. For example, a less developmentally delayed child might have been capable of independently seeing the deviancy in the sexual abuses they were exposed to; they might have been able to internalize alternative, non-deviant behaviors from other adults or peers, or even from media sources. The developmentally delayed child is simply far less capable of mitigating the impact of their abusive or deviant environment.

Physical Abuse

It is frequently assumed that, of the traumas that afflict children, it is sexual abuse that is primarily associated with the development of pedophilia and other forms of abusive sexuality. However, research indicates that other forms of childhood trauma, particularly physical abuse, are also very important risk factors for the development of abusive sexuality.

The records indicate that Mr. Presnell was subjected to serious physical abuse, at the hands of his father as well as Willie McGee, a live-in boyfriend. The brutal, closed-fists assaults that Mr. Presnell was subjected to as a child also suggest that this type of abuse was chronic. Such chronic abuse typically has a very severe impact on the development of the nervous system: essentially, the child's nervous system becomes adapted to an environment of constant threat.

The combination of physical abuse, with its impact on neural development, and the

43

developmental delays that characterized Mr. Presnell, is a very serious interaction that should have been thoroughly explained to the 1999 jury.

## Exposure to Deviant Sexuality

Mr. Presnell was exposed to multiple forms of deviant sexuality. He lived for a time with a sexually abusive uncle who was later convicted of incest. He was exposed to pornography at an early age, and eventually to particularly deviant pornography depicting sexual activity with children. He was exposed to adult sexual behavior long before he was cognitively or emotionally capable of appropriately understanding or integrating what he was witnessing  Finally, while still a child, he was approached sexually by a much older female  This type of exposure would be corrosive to the development of any child, but for someone with Mr. Presnell's limited cognitive and emotional capacities, the exposure is far more dangerous because he had very limited wherewithal to mitigate its influence on his behavior.

## Exposure to Domestic Violence

Similar to childhood physical abuse, there is a widespread under-appreciation of the potentially damaging impact on children of witnessing domestic violence. The effects can be felt in many areas, but two prominent ones are worth mentioning. First, witnessing violence can serve to normalize it – the child learns through modeling that violence between intimates is normal and acceptable  Second, witnessing violence often has a very similar impact on the developing nervous system as physical abuse  Violent incidents within the

44

home are terrifying to the child, and cause them to become forever vigilant about the next eruption. For Mr. Presnell, witnessing violence perpetrated against his mother would have been yet another developmental burden on his already over-taxed cognitive and emotional capacities.

Strong Likelihood of Sexual Abuse

Mr Presnell has apparently denied that he was sexually abused as a child. While this may in fact be the case, there are a number of solid reasons to suspect that he was in fact sexually abused. First, it is widely known that a very large percentage of adult males who were sexually abused as children deny that the abuse occurred They either can no longer remember the abuse, or they are so ashamed about it that they refuse to acknowledge it. This characteristic of male abuse victims has been demonstrated through widespread clinical experience, as well as through research. Male victims who had documented histories of sexual abuse (court and hospital records) were questioned many years later and more than 60% denied that they were in fact sexually abused (Widom & Morris, 1997).

There are a number of indications in Mr. Presnell's history that point to his having been sexually abused:

a       The fact that Mr. Presnell himself sexually abused children puts him in a category in which sexual abuse is extremely likely As I noted earlier, the rate of childhood sexual abuse among child molesters is extremely high; some studies show it to be as high as 90%.

b.      The precocious sexual behavior displayed by Mr. Presnell when he was a child,

45

behavior that was serious enough to raise the
alarms of school officials, is a hallmark of the
sexually abused child  In fact, such premature
sexual behavior is typically considered the
most diagnostic behavior of sexual abuse.

c.       The fact that Mr. Presnell was living in
the same house with a known, confirmed child
molester greatly increases the odds that he was
himself abused.  His uncle James apparently
molested three other children in the house –
why would Mr  Presnell have been spared?

This information, presented above in
outline form only, should have been presented
to the jury  In my opinion, any expert familiar
with childhood sexual abuse would have
opined that the likelihood that Mr. Presnell was
sexually abused was extremely high.

S.H.T. 2364-2367.

27.     Mr. Presnell's trial attorneys should have presented the extensive research

conducted concerning the underlying causes of pedophilia to provide jurors

with meaningful contextual and mitigating evidence.  In Dr  Lisak's words,

"Mr. Presnell's childhood history, which included at least five major risk

factors for the development of pedophilia, could have been presented in this

context, providing the jury with a way of seeing Mr. Presnell as a product of

a deviant and abusive environment, and not simply as a genetically

defective pedophile." *Id.*

46

28.  The defense failure to retain the appropriate expert led to a defense that simply did not provide a "mitigating" picture of this delicate but critical subject  Rather than explaining the issue in terms that would have laid little blame for Virgil's condition on himself, the defense simply told the jury that he was in fact a deviant, and that it was likely genetic   This defense would have only flamed the passions of juror who were already grappling with the tragedy involved in the case.

### (b) Failure to Adequately Prepare and Present Mental Health Evidence.

29.  While the defense hired clinical psychologist Robert Schaeffer, as noted, he was not provided with sufficient information to conduct a valid and fully mitigating presentation to the jury.  Had the defense done its investigative job, and either provided Dr. Schaeffer with the necessary background information or hired an expert with the appropriate training and expertise, the jury would have been provided a full and complete picture of Mr. Presnell's neuropsychological and cognitive impairments.

30.  Unlike Dr. Schaeffer, the neuropsychologist who evaluated Mr  Presnell in state habeas, Dr. Ricardo Weinstein, had the benefit of a full social history, the information in Dr. Lisak's report, and a full picture of Mr. Presnell's

psycho-sexual developmental history. S.H.T. 2294-2297. After reviewing extensive background materials and other documentation, and conducting testing and evaluation on Mr. Presnell, Dr Weinstein concluded that Mr. Presnell suffers from significant cognitive and neuropsychological deficits, including frontal lobe brain dysfunction and Fetal Alcohol Spectrum Disorder (FASD). S.H.T. 2295-2323.

31    As Dr Weinstein documented at length in his report, there is clear evidence that substantial neuropsychological and psychosocial developmental problems exist in people diagnosed with FASD. Particular studies have examined how prenatal alcohol exposure can affect brain functioning and behavior. S.H.T. 2301-2302. It is also known that FASD is probably "the most common cause of mental retardation in the United States, and may be responsible for up to 5% of all congenital abnormalities " S.H.T. 2302-2303. (footnote omitted).

32    Dr Weinstein reviewed the broad potential cognitive impact that occurs in individuals with FASD and noted studies suggesting that alcohol-exposed children, whether they have FASD or not, are at high risk for problem behaviors that can interfere with their participation in home, school, and social environments  S.H.T. 2303-2306. Further, Dr. Weinstien discussed

the risk factors which increase the likelihood of a woman who drinks

alcohol during pregnancy giving birth to a child with FASD   Research

demonstrates that these factors include maternal age, socioeconomic status,

ethnicity, genetic factors, and maternal alcohol metabolism.  Dr. Weinstein

reported that three crucial risk factors are binge drinking, socio-economic

status, and exposure to violence and abuse.  S.H.T. 2306-2307.  Sadly, these

three factors are present in Mr. Presnell's case.

33.    After fully evaluating Mr. Presnell and reviewing his social and physical

history, Dr. Weinstein concluded that Mr. Presnell did suffer from FASD,

that there was significant evidence of neuropsychological deficits associated

with executive functioning, and that the results on the neuropsychological

and psychosocial testing were consistent with a diagnosis of FASD.  S.H.T.

2308-2309.

34.    Dr Weinstein also conducted a complete neuropsychological examination

of Mr. Presnell, subjecting him to a full battery of testing   These tests

revealed that Mr. Presnell suffers from "generalized and diffuse brain

dysfunction":

> The test results indicate clear compromises in frontal
> lobe functions.  The frontal lobes are the areas of the
> brain that are last to develop, both ontogenetically and

> phylogenetically.  They constitute approximately one third of the total brain mass and are responsible for higher cognitive functions.  These include problem solving, spontaneity, memory, language, motivation, judgment, impulse control, planning, organization, reflection, deliberation, social and sexual behavior, and the ability to form and carry out a preconceived design. In addition to orchestrating basic reasoning and planning skills, the frontal lobes are critical in modulating and integrating other facets of behavioral and cognitive output.  These executive functions include the ability to inhibit or suppress nonproductive behavioral tendencies. This frontal lobe dysfunction also significantly compromises Mr. Presnell's capacity to foresee the consequences of his actions and behave in a goal directed manner.

S.H.T. 2310

35    As discussed by Dr. Weinstein, "[t]he most significant dysfunction is

identified in the abilities (or lack thereof) that Mr. Presnell has for abstract

reasoning, logical analysis, and flexibility of thought for complex stimuli

and incidental learning. Memory problems were identified, particularly in

his ability to hold information in memory in order to utilize it in performing

specific tasks ("working memory").  He also demonstrated deficits in

attention, concentration and learning.  These deficits are more acute when

information is presented in a verbal manner." *Id.*

Dr. Weinstein concluded his discussion thusly.

50